IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PHILLIP EVANS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19 C 4508 |
| v. ) | |
| ) | Judge John Z. Lee |
| PATHWAY MANAGEMENT, LLC, ) | |
| d/b/a Pathway to Living, and ) | |
| 407 West 63rd, LLC, d/b/a ) | |
| Aspired Living of Westmont, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Phillip Evans has brought this lawsuit against Pathway Management, LLC ("Pathway Management") and 407 West 63rd LLC ("407 West"). He alleges Defendants discriminated against him based on race when they terminated his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Defendants have moved for summary judgment. For the reasons provided below, the motion is denied.

I. **Factual Background**[1]

Evans, who is black, was a culinary manager at Aspired Living of Westmont ("Aspired Living"), an assisted living community. Pl.'s LR 56.1(b)(3) Statement Additional Facts ("PSOAF") ¶ 25, ECF No. 52; Defs.' LR 56.1(a) Statement Facts ("DSOF") ¶¶ 2, 14–15, ECF No. 45. While employed at Aspired Living, he was paid

---

[1] The following facts are undisputed or deemed admitted unless otherwise noted.

by Pathway of Westmont LLC ("Pathway Westmont"). DSOF ¶ 5. Defendant Pathway Management is the parent organization of Pathway Westmont. *Id.* ¶ 1. Defendant 407 West owns the Aspired Living property and hires and supervises its employees. *Id.* ¶¶ 2–3.

When Evans applied for the position, he interviewed with Robin Pecak, Pathway Management's Executive Director.[2] *Id.* ¶ 15. Evans's supervisors were Pecak and Eli Ayoub,[3] Pathway Management's Director of Culinary Experience, who supervises all culinary managers and kitchen staff at Pathway Management's assisted living facility locations. *Id.* ¶¶ 14, 16; DSOF, Ex. D, Evans's Dep. ("Evans Dep.") at 15:15–16:6, ECF No. 45-5.

When Evans was hired, he received a copy of the employee rules of conduct. *Id.* ¶ 18. The rules stated that "possessing firearms or other weapons on company property" constitutes employee misconduct. *Id.* ¶ 19. Evans also received an employee handbook that included a section entitled, "Zero Tolerance for Violence and Weapons," which provides that "[a]ll team members are prohibited from using,

---

[2] Defendants have also admitted that Pecak is Executive Director of Pathway Westmont. *See* PSOAF, Ex. 5, Defs.' Mandatory Initial Discovery Resps. ("Defs.' MIDP Resps.") ¶ 1.b, ECF No. 52-5.

[3] Defendants have submitted Ayoub's declaration with their reply brief. *See* Defs.' Reply Supp. Mot. Summ. J., Ex. 1, Ayoub Decl., ECF No. 59-1. Local Rule 56.1(c)(2) allows the moving party to submit "any *cited* evidentiary material not attached to the LR 56.1(a)(3) statement, the LR 56.1(b)(2) response or the LR 56.1(b)(3) statement" (emphasis added). Because Ayoub's declaration is not cited in support of any statement of fact, the Court has no occasion to consider it in ruling on the summary judgment motion.

displaying, or carrying firearms, knives or any other lethal weapons on company property. Unless otherwise prohibited by applicable state law, Company property also includes company parking lots." *Id.* ¶¶ 21, 25. He also admits signing a form indicating that he would comply with the policies as stated in the employee handbook. *Id.* ¶ 24.

At all relevant times, the employee handbook specified different levels of discipline for different types of conduct, including level 1, level 2, and level 3 violations. *Id.* ¶ 22. As described in the handbook, the possession of firearms or weapons on company property constitutes a level 3 violation. *Id.* ¶ 23. The handbook provides that a level 3 violation "may result in a suspension without pay during which time an investigation into the facts surrounding the violation will be conducted. Team members found to have committed Level 3 violations may have their suspension converted to termination." *Id.* ¶ 24.

One of Evans's subordinates, Luz Rojas, told a maintenance manager at the Westmont facility, who, in turn, told Pecak on February 28, 2018, that Evans had shown Rojas his gun while on company property. *Id.* ¶ 26; PSOAF ¶ 50; Evans Dep. at 72:18–23.[4] Pecak relayed that information to Lisa Rogers, Director of Human

---

[4] Although Evans characterizes Rojas's statement as "false," he has not cited any evidence to support that characterization. *See* PSOAF ¶ 50 (citing exhibits that merely state that a report was made). However, as will be discussed, Evans has established that Defendants did not terminate him based on the fact that he had brought his weapon into the workplace and showed it to Rojas. *Id.* ¶ 53. Rather, Defendants terminated him based on its conclusion that Evans had admitted to keeping a firearm in his vehicle on company property. *Id.* ¶ 54.

3

Resources of Pathway Management. DSOF ¶ 27.

That same day, Ayoub asked Evans to meet with Rogers, Pecak, and him. *Id.* ¶ 28. Ayoub was the only person to ask Evans questions during the meeting, and Ayoub eventually informed Evans that he had been accused of brandishing a firearm at work. *Id.* ¶ 30. When Ayoub asked Evans whether he had ever brought his firearm into work and shown it to anyone, Evans denied having done so. *Id.* ¶ 29. Ayoub told him to take the rest of the day off and said they would investigate the matter. *Id.* ¶ 31. As part of the investigation, Ayoub asked Evans to provide a written statement regarding the accusation. PSOAF ¶ 45.

The next day, in response to Ayoub's request, Evans submitted the following written statement:

> I am giving an official statement about the accusation of brandishing a firearm in the community. I did not or at any time brandish a firearm in the community. I am aware that it is against Pathway policy to possess a firearm on the premises.
>
> I believe that I may be able to shed some light on the allegations, however. I am a FOID and a CCW license holder and speak about it openly as I believe in the 2nd amendment [sic] right for law abiding citizens. I have been known to talk about my ability to carry as well. In various conversations, due to current events around the nation, safety is a hot topic and discussed all the time. As a manager, I assure them of their safety. I assure them, not because I carry, but because that is what I am supposed to do as a manager. It is my job to insure to my subordinates that they work in a safe environment. *Because I know of Pathway's policy, I leave my firearm in my truck. I keep it in a locked case, as instructed by law and many times keep on the waistband holster for it for when I am able to carry.*

4

> If I reach in my pocket for keys or if I am reaching high for a case on the shelves, it is possible my chef jacket could get caught behind it because it sticks out just a tad, exposing it to anyone close by. I am always moving and talking at the same time so no matter the subject of the conversation the two happening coincidentally is regrettably feasible.
>
> I hope this helps and I apologize for any inconv[en]ience.

DSOF ¶ 33; *id.*, Ex. J, Evans's 3/1/18 Statement ("3/1/18 Statement") (emphasis added), ECF No. 45-11. Evans, a concealed-carry-license holder, believed that securing his firearm in his truck, as permitted by Illinois law, was not inconsistent with company policy. PSOAF ¶ 60.

According to Rogers, based on the investigation and Evans's submission, she determined that Evans had admitted to violating company policy and committing a level 3 violation, and she decided to terminate his employment on March 3, 2018. *Id.* ¶¶ 37, 42, 54–55, 57; Defs.' Resp. PSOAF ¶ 54, ECF No. 60. Rogers also states that, prior to the termination of Evans's employment, she had no knowledge that any other employee had kept guns in their vehicles on company property. DSOF ¶ 38.

To hear Evans tell it, his supervisor, Ayoub, had influenced Rogers's decision to terminate him. Pl.'s Resp. DSOF ("RSOF") ¶ 37, ECF No. 52. Although he does not know this for sure, there are facts in the record that support Evans's belief. *See* Evans's Dep. at 90:3–5. First, Ayoub actively participated in the investigation by asking him questions at the meeting about the incident and by requesting that Evans submit an official written statement. *See id.* at 56:10–57:24. Additionally, as

5

Ayoub's subordinate, Evans observed that Ayoub controlled the daily operations of the kitchen, which included doling out disciplinary action. PSOAF, Ex. 6, Evans Aff. ("Evans Aff.") ¶ 21, ECF No. 52-6. Furthermore, it was Ayoub who had instructed him not to return to work. *See id.* at 90:3–5.

According to Evans, prior to his termination, Ayoub had discussed the matter of guns and concealed-carry licenses at a meeting with his subordinates, including white culinary managers named Larry (a Bartlett/Grayslake manager), Mike (a Wheaton manager), Marc (a Minnesota manager), and Steve (a northern Illinois manager). DSOF 14; PSOAF ¶ 42; Evans Dep. at 15:15–16:6.[5] Ayoub even suggested that his subordinates go to a shooting range as a team-building exercise. PSOAF ¶ 41. The white managers stated that, because they had concealed-carry licenses, they kept their firearms with them at all times in their vehicles. PSOAF ¶

---

[5] Defendants argue that Evans cannot rely on his affidavit that states Ayoub took part in this conversation because it contradicts Evans's testimony during his deposition. *See LaFary v. Rogers Grp., Inc.*, 591 F.3d 903, 908 (7th Cir. 2010) ("A plaintiff cannot defeat a motion for summary judgment by contradict[ing] deposition testimony with later-filed contradictory affidavits.") (cleaned up). With regard to certain conversations between Evans and culinary managers named Perry (a Joliet manager), Mike (a Calumet City manager), and Vincent (a Wisconsin manager), Defendants are correct that Evans cannot submit a conflicting affidavit to contradict his prior testimony that definitively stated Ayoub was not present. *See* Evans Dep. at 108:9–10, 110:1–6, 111:1–20. But with regard to the above-mentioned conversation between Ayoub, Evans, Larry, Mike, Marc, and Brad, Evans previously testified that Ayoub was present at the meeting at which the conversation took place, but he could not recall whether Ayoub took part in the conversation. *Id.* at 97:7–96:9, 100:22–24. In his affidavit, Evans explains his lapse in memory at his deposition and now recalls that Ayoub was an active and enthusiastic participant in the conversation. Evans Aff. ¶¶ 10–14. Such use is proper. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995) (stating that an affidavit may be considered where a lapse of memory is a plausible explanation for the discrepancy).

42. During that same conversation, a white culinary manager named Brad specifically admitted to bringing his shotgun to work on occasion, because he goes hunting after work. *Id.* ¶ 43. Evans contends that Ayoub influenced the decision to fire Evans by concealing this information from Rogers and Pecak. *See* DSOF ¶ 38.

Evans also points to another incident to support that a similarly situated white employee received better treatment than he. A month before Evans's employment was terminated, Scott Dudgeon, a white cook who worked under Ayoub and Evans, admitted that he had yelled at a resident, and the incident was investigated by Pecak and Ayoub. PSOAF ¶ 61; Evans Dep. at 157:18–22, 161:14–23; Evans Aff. ¶ 16.[6] The employee handbook states that "antagonistic conduct directed towards residents . . . on company premises" constitutes a level 3 violation. 2017 Handbook at PL000116; 2018 Handbook at DEF000097. Ayoub informed Evans that he had excused Dudgeon's behavior toward the resident. PSOAF ¶ 29; Evans Aff. ¶ 23.[7] Furthermore, Dudgeon remained an employee even after Evans had been fired. Evans Dep. at 68:21–70:23, 154:2–6.

Based on his termination, Evans filed a charge of race discrimination against

---

[6] Maureen Kipfer, the human resources manager who informed Evans of the incidents involving Scott and the ensuing investigation, was an employee of Defendants at the time and the statement was made within the scope of her authority; accordingly, the statement is admissible under Fed. R. Evid. 801(d)(2)(D).

[7] As with Maureen Kipfer, Ayoub's statement is admissible under Rule 801(d)(2)(D).

Pathway to Living/Aspired Living of Westmont with the Equal Employment Opportunity Commission ("EEOC"). PSOAF, Ex. 1B, EEOC Charge and Am. EEOC Charge at PL000004–05, ECF No. 52-1. After receiving his right-to-sue notice, Evans filed this lawsuit. *Id.*, Ex. 1A, Notice of Suit Rights at PL000002.

## II. <u>Legal Standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). To satisfy that ultimate burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### III. <u>Analysis</u>

Defendants Pathway Management and 407 West raise two arguments in support of summary judgment. First, they assert that Evans has sued the wrong entities and has failed to exhaust his administrative remedies as to the correct one. Second, they contend that he has failed to raise a material issue of fact regarding his race discrimination claim.

### A. **Correct Entities as Defendants**

Defendants initially argue that, because Evans received his paychecks from Pathway Westmont, he should have sued it, rather than Pathway Management and 407 West. But it is undisputed that Rogers, a Pathway Management employee, was the decisionmaker in the termination of Evans's employment; that his direct supervisors were Pathway Management employees; and that 407 West was responsible for the supervision of employees, like Evans, at Aspired Living in Westmont. PSOAF ¶¶ 55, 57; RSOF ¶ 42; DSOF ¶¶ 2–3, 14, 16; *id.*, Ex. C, Rogers Decl. ("Rogers Decl.") ¶ 1, ECF No. 45-4. It is also undisputed that Evans's supervisors were Pecak and Ayoub, both of whom are Pathway Management

9

employees. DSOF ¶¶ 14, 16. Accordingly, at a minimum, there exists a genuine issue of material fact as to whether Defendants were Evans's employers, and their motion for summary judgment on this basis is denied.

Defendants also argue that Evans has failed to exhaust his administrative remedies as to Pathway Westmont (which is not a named defendant) by omitting it from his EEOC charge. Generally speaking, a party not named in an EEOC charge may not be sued. *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir 2013). This rule "serves to notify the charged party of the alleged violation" and provides "the EEOC an opportunity for conciliation." *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir 1989).

But the Seventh Circuit recognizes an exception where an unnamed party has had adequate notice of the discrimination charge and an opportunity to participate in the conciliation proceedings, if there were any. *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890 (7th Cir. 1981); *see Stevo v. CSX Corp.*, No. 05 C 7251, 2007 WL 9813283, at *2 (N.D. Ill. Mar. 27, 2007). Defendants' initial discovery disclosures lists Pecak as an employee of Pathway Westmont. As a result of these and other discovery responses, Evans's counsel contacted Pecak through Pathway Management's counsel. PSOAF, Ex. 5, Defs.' MIDP Resps. ¶ 1.b, ECF No. 52-5. Furthermore, Defendants have submitted Pecak's declaration, stating that she had received the report of Evans's brandishing a firearm at work, participated in the meeting where Evans had been made aware of the accusation, and signed Evans's

10

termination notice. *See* DSOF, Ex. E, Pecak Decl. ¶¶ 1–6, ECF No. 45-6. Because Pecak played a central role in Evans's firing, she was an employee of Pathway Westmont, and she was made available by Pathway Management's counsel, it is reasonable to believe based on this record that an investigation by the EEOC into Evans's discrimination charge would have put Pathway Westmont on notice of his allegations and that, as a result, it would have had an opportunity to participate in any administrative conciliation proceedings. Accordingly, summary judgment on this ground is denied as well.

### B. Race Discrimination

Next, Defendants assert that Evans has failed to raise a triable issue as to the merits of his race discrimination claim. Evans counters that a reasonable jury could find that, all else being equal, he would not have been fired if he was not black.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . race." 42 U.S.C. § 2000e-2(a)(1). To avoid summary judgment on his race-discrimination claims, a plaintiff must show that the evidence, considered as a whole, would permit a reasonable fact finder to conclude that his or her protected status caused adverse employment actions. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). As the Seventh Circuit held in *Ortiz*, "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766.

11

The pivotal question here is "whether [plaintiff] has created a genuine issue concerning the sincerity of the proffered reasons" given for the adverse employment action. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993). To this end, "an employee may show that the employer's reason had no basis in fact, that the explanation was not the real reason for its action or that the reason stated was insufficient to warrant the adverse job action." *Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008) (cleaned up);

It is undisputed that the stated reason for the termination was that Evans had violated the company's policy prohibiting firearms on company property. Evans contends, however, that this reason lacks any basis in fact and was merely pretext. *See Alade v. Underwriters Lab'ys*, Inc., 636 F. App'x 938, 939 (7th Cir. 2016) (stating that, to show his supervisor did not honestly believe he was performing poorly, plaintiff could present evidence that his performance problems had no basis in fact).

Specifically, Evans argues that, at the time he was fired, he was exempt from the policy forbidding him from keeping a firearm in a locked case in his truck in the company parking lot, because he had a concealed carry license consistent with the Illinois Firearm Concealed Carry Act, 430 Ill. Comp. Stat. 66/65(b) (effective 7/10/15 to 6/27/19). That statute does state that a licensee "shall not knowingly carry a firearm on or into . . . [a]ny building, real property, and parking area under the control of a nursing home." *Id.* 66/65(a)(7). But the Act also provides:

> [A]ny licensee prohibited from carrying a concealed firearm into the parking area of a prohibited location . . . shall be

12

> permitted to carry a concealed firearm on or about his or her person within a vehicle into the parking area and may store a firearm or ammunition concealed in a case within a locked vehicle or locked container out of plain view within the vehicle in the parking area.

*Id.* Evans then points to the language of Defendants' policy, which recognizes that the policy is void to the extent it is inconsistent with state law. PSOAF ¶ 21; DSOF, Ex. H, 2017 Handbook ("2017 Handbook") at PL000113, ECF No. 45-9 ("*Unless otherwise prohibited by applicable state law*, Company property also includes company parking lots.")(emphasis added); *id.*, Ex. I, 2018 Handbook ("2018 Handbook"), at DEF000094, ECF No. 45-10 (same). Thus, Evans argues, the policy actually permitted him to keep his gun in his car, even though it was in the company parking lot, and Defendants' stated reason for terminating him was unfounded. The Court finds Evans's interpretation of the policy persuasive, and he has raised a triable issue as to whether he was fired based on an honest belief that he had violated the policy.

Additionally, Evans asserts that Ayoub had harbored racial animus against him and had influenced Rogers's termination decision in the background. RSOF ¶ 37. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (characterizing this theory as "a cat's paw theory of liability, meaning that the ultimate decisionmaker issued an adverse employment action based on the discriminatory animus of another"). A defendant "can defeat this tack . . . by showing that . . . the decisionmaker did an independent analysis and came to h[er]

13

own conclusion." *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452–53 (7th Cir. 2009).

In response, Defendants insist that Rogers relied upon her own investigation, but the only investigation described in the record is the one in which Ayoub participated. *See* Defs' Resp. PSOAF ¶ 54. And, indeed, Rogers herself does not assert that she conducted an independent analysis, other than the one described. *See generally* Rogers Decl. What is more, given that Evans's actions did not actually violate company policy, a rational jury could find that Rogers terminated him for some reason other than an honest belief that she had.

It is true that Evans admits that he does not know for certain who had made the determination to fire him, *see* Evans Dep. at 90:3–5, but there are facts in the record to support the conclusion that Ayoub had participated in it. First, Ayoub actively participated in the investigation that led to Evans's termination. Ayoub was the only employee to question Evans regarding the incident and requested that he provide an official written statement. *See id.* at 56:10–57:24. Additionally, Ayoub controlled the day-to-day operations of the kitchen, including the discipline of his workers. Evans Aff. ¶ 21. And it was Ayoub who had instructed Evans not to return to work. *See* Evans Dep. at 90:3–5. From this, a reasonable jury could conclude that Ayoub had influenced the termination decision.

Furthermore, there are facts from which a reasonable jury could conclude that Ayoub harbored discriminatory animus. Prior to the termination of Evans's

14

employment, Ayoub had a conversation about concealed-carry licenses and firearms with his subordinates at a team meeting. DSOF ¶ 14; PSOAF ¶ 42; Evans Dep. at 15:15–16:6. During the conversation, white culinary managers stated that, because they had concealed-carry licenses, they kept their firearms with them at all times in their vehicle. PSOAF ¶ 42. Also, another white culinary manager admitted to bringing his shotgun to work on occasion. *Id.* ¶ 43. Yet, Ayoub did not inform Rogers or Pecak of this prior to Evans's termination. *See* DSOF ¶ 38. From this, a reasonable jury could find that Ayoub was aware that white managers stored firearms in their vehicles in company parking lots and, yet, supported terminating Evans for the same behavior.

But this is not all. A month before Evans's firing, Scott Dudgeon, a white cook, admitted to Pecak and Ayoub that he had yelled at a resident. PSOAF ¶ 61; Evans Dep. at 157:18–22, 161:14–23; Evans Aff. ¶ 16. The employee handbook states that "antagonistic conduct directed towards residents . . . on company premises" constitutes a level 3 violation. 2017 Handbook at PL000116; 2018 Handbook at DEF000097. And, although Evans is not certain whether Dudgeon's infraction was a level 3 violation, these facts create a reasonable inference that it was. Yet Dudgeon was not terminated for his actions.

Defendants point out that Dudgeon worked under Evans and, thus, is not a similarly situated to Evans. But, like Evans, Dudgeon was Ayoub's subordinate. DSOF ¶ 14. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) ("A

15

meaningful comparison is one which serves to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel . . . ." (cleaned up)). And there are facts in the record from which a reasonable jury could find that it was Ayoub who decided not to fire Dudgeon. Indeed, according to Evans, Ayoub told him that Ayoub had excused Dudgeon's behavior. PSOAF ¶ 29; Evans Aff. ¶ 23. And, as noted, Dudgeon remained an employee afterwards. Evans Dep. at 68:21–70:23, 154:2–6.

Based on the above, Evans has satisfied his burden to establish numerous genuine issues of material fact as to his claims that must be resolved by the jury. Accordingly, Defendants' summary judgment motion as to the merits of the claims is denied.

## IV. Conclusion

For the reasons given above, Defendants' summary judgment motion is denied.

**IT IS SO ORDERED.**  ENTERED   9/29/21

_____
**John Z. Lee**
**United States District Judge**